UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CURT HEPP, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 4692 |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| ULTRA GREEN ENERGY SERVICES LLC; | ) | |
| and M1 ENERGY RISK MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The Plaintiff, Curt Hepp, filed a two-count amended complaint against the Defendants, Ultra Green Energy Services LLC ("Ultra Green") and M1 Energy Risk Management, LLC ("M1 Energy") alleging a breach of contract claim in each count. R. 53. Ultra Green has filed a third-party complaint against Cathy W. Pierce ("Cathy"), Robert J. Pierce ("Robert"), and M1 Energy. R. 6. On April 4, 2014, Ultra Green has filed a motion to dismiss Hepp's amended complaint, contending that it fails to state a claim under Federal Rule of Civil Procedure 12(b)(6), and in any event, does not meet the $75,000 jurisdictional requirement of 28 U.S.C. § 1332. R. 54. For the reasons that follow, the motion is denied.

**BACKGROUND**

Hepp is a commodities trader who lives in Texas. R. 53 ¶ 2. Ultra Green is a limited liability corporation engaged in the sale and distribution of biofuels. *Id.* ¶ 7. From at least 2010 until sometime in 2013, Ultra Green was managed by Robert and Cathy. *Id.* M1 Energy is also a limited liability corporation, but it provides

financing for biodiesel purchase and trading. *Id.* ¶ 8. Robert is the manager of M1 Energy. *Id.*

On October 5, 2010, Hepp and Ultra Green, with Robert acting as Ultra Green's agent, entered into a "biodiesel financial swap." *Id.* ¶ 9; *see* R. 53-1. The parties were essentially predicting what the United States government would do regarding "biodiesel blending credit." R. 53 ¶ 9. If the government adopted the credit by March 31, 2011, Ultra Green would pay Hepp $375,000; if it did not, Hepp would pay Ultra Green $125,000. *Id.* Ultra Green wanted security in the event Hepp was ultimately required to pay Ultra Green on the biodiesel financial swap. *Id.* ¶ 10. The parties discussed various alternatives but eventually agreed that Hepp would provide $125,000 cash in exchange for a promissory note that included an 18% interest rate. *Id.* Ultra Green wanted to provide financing for M1 Energy, its affiliate, so the parties agreed that Hepp would provide the money to M1 Energy and that Ultra Green would guarantee M1 Energy's payment of the note and any outstanding amounts if M1 Energy defaulted. *Id.* ¶ 11. With M1 Energy's promise to pay and Ultra Green's guarantee, Hepp accepted the offers, including the "biodiesel financial swap," and agreed to provide the financing to M1 Energy. *Id.* According to Hepp, at all pertinent times Robert was acting on behalf of both M1 Energy and Ultra Green and held himself out as having the authority to do so. *Id.*

On October 27, 2010, Hepp provided $112,000 to M1 Energy via wire transfer through an intermediary. *Id.* ¶ 12. In return, M1 Energy promised to pay Hepp

$125,000 on May 31, 2011 ("Note 1").[1] *Id.* ¶ 12; *see* R. 53-2. Note 1 contained an "unconditional guarantee" that Ultra Green would pay Hepp if M1 Energy defaulted. *Id.* ¶ 13.

On December 17, 2010, President Obama signed H.R. 4853, the Tax Relief, Unemployment Insurance Reauthorization, Job Creation Act of 2010 (Public Law No: 111-312), extending several alternative fuel tax credits through December 31, 2011. *Id.* ¶ 14. The law included the biodiesel credits the parties here bargained over, so basically, Hepp won. *Id.* Thus, Hepp was entitled to the $375,000 payout on the biodiesel financial swap by March 31, 2011, from either M1 Energy or Ultra Green. *Id.* M1 Energy and Ultra Green attempted to satisfy the $500,000 payment obligation—i.e., the $125,000 promissory note and the $375,000 on the biodiesel financial swap—via a cash payment and two additional notes. *Id.* ¶ 15.

On February 15, 2011, M1 Energy and Hepp entered into a secured note for $125,000 ("Note 2"). *Id.* ¶ 16; *see* R. 53-3. Note 2 provides that M1 Energy will pay interest each month at a rate of 18% and that M1 Energy will repay the indebtness within 30 days of a demand by Hepp. *Id.* ¶ 17. It also included an "unconditional guarantee" by Ultra Green, among other terms favorable to Hepp. *Id.* ¶ 18. The note was signed by Robert, on behalf of M1 Energy as its President and Ultra Green as its Managing Member. R. 53-3.

A week later, on February 22, 2011, Ultra Green wire transferred $250,000 to a bank account for Hepp. *Id.* ¶ 22. Also on that day, Hepp and M1 Energy entered

---

[1] With the agreed-upon interest rate of 18%, $112,000 on October 27, 2010, was the present cash value of $125,000 on May 31, 2011. *Id.* ¶ 11.

3

into a third note; this one in the amount of $ 45,398 ("Note 3"). *Id.* ¶ 23; *see* R. 53-4. The principal amount of $245,398[2] represented the remainder of what Ultra Green owed Hepp under their original biodiesel financial swap agreement.[3] R. 53 ¶ 23. Hepp agreed to accept the note instead of additional cash payments from Ultra Green. *Id.* Note 3 contained similar terms to those in Note 2, including an 18% interest rate and a promise on behalf of Ultra Green to "unconditionally guarantee" the note. *Id.* The note further stated that "[t]he indebtnedess . . . shall be payable on demand plus 30 days." R. 53-4. It was signed by Robert, on behalf of M1 Energy as its President and Ultra Green as its Managing Member. *Id.*

On June 1, 2011, Hepp received $70,398 from M1 Energy, reducing the outstanding amount owed to Hepp on Note 3 to $175,000. R. 53 ¶ 29. Since that date, no further principal payments or interest payments have been made to Hepp. *Id.*

On March 22, 2012, Hepp made a demand on M1 Energy to pay the required interest payments and return the unpaid principal on Note 3. *Id.* ¶ 31. M1 Energy has not done so. *Id.* Hepp discussed this lack of payment with Ultra Green and demanded that Ultra Green fulfill its guarantor obligation on the note. *Id.* ¶ 32. Ultra Green has refused to do so. *Id.* Hepp alleges that Robert, on behalf of Ultra

---

[2] $245,398 on February 22, 2011, was equal to the present value of $250,000 on March 31, 2011, using an 18% interest rate.

[3] Hepp's amended complaint contains two different dates. He first alleges in his amended complaint that the parties entered into the biodiesel financial swap on October 5, 2010, R. 53 ¶ 9, but later alleges in a subsequent paragraph that the agreement occurred on September 24, 2010. *Id.* ¶ 23. Both dates appear on the agreement attached to Hepp's amended complaint. *See* R. 53-1.

4

Green and M1 Energy, recognized on various occasions in 2013 that both Ultra Green and M1 Energy were legally obligated to pay Hepp. *Id.* ¶ 35. Hepp further alleges that Robert and Cathy told other Ultra Green members and potential buyers about Ultra Green's obligation on Note 3. *Id.* ¶¶ 35-36. This includes an email dated April 2, 2013, to various parties disclosing Ultra Green's guarantee of Note 3; and an email dated April 22, 2013, to Bill Pas, the agent for the eventual buyer of Ultra Green, noting that Ultra Green owed Hepp $175,000 on the note. *Id.*; *see* R. 53-5; R. 53-6.

## LEGAL STANDARD

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This "standard demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

5

the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

## ANALYSIS

Ultra Green sets forth a number of arguments as to why Hepp's amended complaint should be dismissed; none are persuasive.[4] First, Ultra Green takes issue with Hepp's allegation that an "intermediary" provided the $112,000 that M1 Energy received on the first note. R. 55 at 2. The specific arguments being made and the legal basis for them are not entirely clear, but Ultra Green seems to be making an argument that there was a lack of a consideration on the notes and a lack of standing on the part of Hepp to sue on the notes. Regarding a lack of consideration, Ultra Green provides a general citation to *Tcherepnin v. Franz*, 457 F. Supp. 832, 837 (N.D. Ill. 1978), and argues that the consideration supporting Notes 1, 2, and 3 is insufficient as pled because Ultra Green did not enter into an agreement with the intermediary and Hepp has not set forth his relationship with

---

[4] Ultra Green included various exhibits in its reply brief that were neither referred to in Hepp's amended complaint nor included in its motion to dismiss. The Court will not consider these in its ruling because it is axiomatic that arguments and issues raised in a reply brief are waived. *United States v. Fluker*, 698 F.3d 988, 1004 (7th Cir. 2012); *see Harrison v. Helman*, 191 F.3d 456, 456 (7th Cir. 1999) (striking exhibits attached to the appellant's reply brief). They also are not the type of documents of which a court generally takes judicial notice. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012) (stating that a court may "consider public documents and reports of administrative bodies that are proper subjects for judicial notice, though caution is necessary, of course").

the intermediary. Therefore, according to Ultra Green, there was no consideration supporting the notes. R. 55 at 4-5. But this argument misses the precise language used in the allegation. Hepp alleges, "On or about October 27, 2010, *Hepp provided* $112,000 to M1 Energy; *Hepp did so* via wire transfer *through* an intermediary." R. 53 ¶ 12 (emphasis added). In other words, Hepp alleged that he was responsible for providing the payment, regardless of the method by which it was transmitted and later received. That is a sufficient allegation to support a finding of consideration at the motion to dismiss stage. He does not need to provide "the source of funds," as Ultra Green contends, R. 55 at 4, as long as he alleges that the $112,000 was provided on his behalf. *See Urban Sites of Chi., LLC v. Crown Castle USA*, 979 N.E.2d 480, 493 (Ill. App. Ct. 1st Dist. 2012) ("Any act of promise which is of benefit to one party or disadvantage to the other is sufficient consideration to support a contract." (quoting *Steinberg v. Chi. Med. School*, 371 N.E.2d 634, 639 (Ill. 1977))).

Ultra Green's standing argument is non-availing. Ultra Green provides the following hypothetical:

> Suppose it agrees to settle with Hepp, how would such a settlement prevent the intermediary from pressing a claim for $112,000, plus interest, against UGES? Under that scenario UGES would be subjecting itself to civil double jeopardy. UGES should not be required to accept such a risk.

R. 55 at 5. This speculative situation does not address the substance of Hepp's claim and cuts directly against the motion to dismiss standard of taking all alleged facts as true and drawing all inferences in favor of the non-moving party. Hepp alleges that he provided the funds—and directly provided them to M1 Energy, not Ultra

Green. R. 53 ¶ 12. That is enough to establish Hepp's standing to bring a claim related to the payment. Additionally, as Hepp acknowledges in his response, Hepp is actually seeking payment from Ultra Green on Note 3, under which M1 Energy agreed to pay him $245,398 and Ultra Green agreed to be M1 Energy's guarantor. R. 58 at 2-3. It is undisputed that Hepp is listed as the "Lender" on the note, M1 Energy as the "Borrower," and Ultra Green as the "Guarantor." R. 53-4. Thus, there can be no doubt at this stage that Hepp has standing to bring a claim for breach of contract on Note 3.

Finally, Ultra Green argues that Hepp has not satisfied the $75,000 jurisdictional requirement of 28 U.S.C. § 1332 because $125,000 must be subtracted from the amount to which Hepp claims he is entitled. R. 55 at 5. This argument fails because, as discussed above, there is no issue regarding the $112,000 (plus interest) consideration payment at this stage. Additionally, the amount in controversy is determined by the amount a plaintiff is seeking, not what he ultimately may recover. *See Grinnell Mut. Reinsurance Co. v. Haight*, 697 F.3d 582, 585 (7th Cir. 2012). Hepp alleges that he is entitled to $175,000, which is based on Note 3 and the allegation that he has only received $70,398 towards the $245,398 obligation, plus attorney's fees. R. 53 ¶ 29. That satisfies the $75,000 amount in controversy requirement.

## CONCLUSION

Ultra Green's motion to dismiss Hepp's amended complaint, R. 54, is denied. The parties are directed to appear at the previously-scheduled status hearing set for June 4, 2014, at 9:00 a.m.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: May 22, 2014