UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CURT HEPP, | ) | |
| | ) | No. 13 C 4692 |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| ULTRA GREEN ENERGY SERVICES, LLC AND | ) | |
| M1 ENERGY RISK MANAGEMENT, LLC, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Ultra Green Energy Services, LLC ("Ultra Green") guaranteed a promissory note payable by defendant M1 Energy Risk Management, LLC ("M1") to plaintiff Curt Hepp. Hepp claims that M1's default on the note triggered Ultra Green's guarantee obligation, and he has moved for summary judgment against it.[1] Ultra Green contends that the guaranty is unenforceable because: (1) the company's Managing Member, Robert J. Pierce, was not authorized to execute the guaranty on its behalf; and (2) the parties' agreement was not supported by consideration. For the following reasons, the Court denies Hepp's summary judgment motion.

**BACKGROUND**

Ultra Green and Hepp entered into a biodiesel financial swap agreement (the "Swap Agreement") brokered by a third party, IVG Energy Ltd. ("IVG"). R. 109 ¶¶

---

[1] Hepp's two-count amended complaint alleges breach-of-contract claims against Ultra Green (Count I) and M1 (Count II). R. 53 ¶¶ 38-48. M1 has not filed an appearance in this case—indeed, it is unclear whether it was ever served. Hepp's motion is directed to Ultra Green (Count I), only. *See* R. 107 at 1; R. 108 at 1, 9.

1-2. The first page of the document memorializing the transaction recites certain "financial" terms, including the "Deal Date" (September 24, 2010), the "Seller" (Ultra Green), the "Buyer" (Hepp), the contract period ("Sep 24, 2010 thru Mar 31, 2011"), the "Terms for Buyer" ("Buyer pays $.25/gallon to the Seller"), the "Terms for Seller" ("Seller receives $.25/gallon"), "Total Volume" ("500,000 gallons"), and "Broker Agreement" (IVG "is to receive $0.0125 USD PER Gallons from [Ultra Green] with invoice forthcoming"). R. 109-1 at 6. On the second page of the document, below the heading "Confirmation Comments," the agreement states the swap's expiration date (March 31, 2011) and the following settlement and payment terms:

> Settlement: If USA passes blending credit retroactively for all of calendar 2010 on or before March 31, 2011 for a blending credit of $1 per gallon, Seller shall pay US $375,000 to Buyer. If USA does not pass biodiesel blending credit by March 31, 2011 retroactively for all of calendar 2010, Buyer shall pay US $125,000 to Seller.
>
> [. . .]
>
> Payment Due Date: Buyer shall be obligated by [sic] to pay Seller $125,000 on or before May 31, 2011 if the Blending Credit is not enacted retroactively for all of 2010 by March 31, 2011. Seller shall pay to Buyer the amount of the Seller's obligation on or before 60 days following the reinstatement of the US Biodiesel Blending Credit retroactively for all of calendar 2010, as long as the blending credit is enacted by or before March 31, 2011.

*Id.* at 7 (capitalization and formatting in original). The copy of the Swap Agreement in the record includes a handwritten notation by Pierce, Ultra Green's Managing Member, indicating that the company "accepted" these terms on October 5, 2010. *Id.* at 6-7.

The parties initially discussed having Hepp obtain a letter of credit securing his contingent obligation to Ultra Green. R. 109 ¶ 3. Instead, Hepp agreed to pay $125,000 to M1, a company that Pierce owned and which owned a 5% ownership interest in Ultra Green. R. 115 ¶ 3. In exchange for this payment, M1 (as "Borrower") promised to pay Hepp (as "Lender") $125,000 on May 31, 2011 (the date on which Hepp would be required to pay Ultra Green under the Swap Agreement if the "blending credit" was not reinstated). The parties memorialized their agreement in a promissory note dated October 8, 2010. R. 109-1 at 9-10 (the "First Secured Note").[2] Ultra Green agreed to "unconditionally" guarantee M1's obligations under the note, *id.* at 10, which included the obligation "to pay all costs of collection including reasonable attorneys' fees, incurred in the collection of" the note. *Id.* at 9.[3] Ultra Green also granted Hepp a security interest in all of its assets and receivables. *Id.* Pierce signed the promissory note on behalf of M1 (as its President) and Ultra Green (as its Managing Member). *Id.* at 10.

On October 25, 2010, Al Pollard of IVG sent an email to a group of recipients including Hepp and Pierce. *See* R. 111-6.[4] In the email, Pollard asserted that Hepp

---

[2] The signature page attached to the First Secured Note indicates that it was "subscribed and sworn" before a notary public on October 5, 2010, the date on which Ultra Green accepted the Swap Agreement's terms. R. 109-1 at 10.

[3] The First Secured Note referred to "the payment of interest" without designating a particular interest rate. R. 109-1 at 9. The parties agree, however, that M1 was required to pay 18% annual interest on the principal. *See* R. 115 ¶ 5.

[4] The parties have not identified the other individuals on the email. It appears from their emails addresses, however, that they were affiliated with IVG. *See* R. 111-6 at

still had not wired money to "UGES" (i.e., Ultra Green) in connection with the First Secured Note. *Id.* at 2. (It is unclear why Pollard believed that Hepp was required to send the money to Ultra Green rather than M1, the "Borrower" under the First Secured Note.) Pollard gave Hepp until October 27, 2010, to pay Ultra Green or else "break the trade that was executed on 9/24/10." *Id.* If Hepp wished to break the trade, Pollard advised him to "call [Ultra Green] and try to negotiate a mutually agreeable settlement, for the BTC Swap transaction and/or the subsequent financing transaction." *Id.* On October 27, 2010, Hepp wired $112,000—"the present value of $125,000 on May 31, 2011 at an 18% interest rate"—to M1, not Ultra Green. R. 109 ¶ 5.

On or about December 17, 2010, President Obama signed H.R. 485, the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010 (P.L. No. 111-312). *Id.* at ¶ 7. The Act extended and reinstated several alternative fuel tax credits through December 31, 2011, including the biodiesel blending credit. *Id.* So, under the terms of the Swap Agreement, Ultra Green became obligated to pay Hepp $375,000 by February 15, 2011 (60 days after the Act became law). *Id.*[5] On that date, the parties "replaced" the First Secured Note with a new note in the

---

[2] (besides Pollard, Hepp, and Pierce, the recipient list includes three other individuals with "@ivgenergy.com" email addresses).

[5] Hepp incorrectly identifies the due date as March 31, 2011. *See* R. 109 ¶ 7; R. 109-2 ¶ 8 (Aff. of Curt Hepp). Ultra Green's liability was triggered if the government reinstated the tax credit before that date, but *payment* was due 60 days after reinstatement. *See* R. 109-1 at 7 ("Seller shall pay to Buyer the amount of Seller's obligation on or before 60 days following the reinstatement of the US Biodiesel Blending Credit retroactively for all of calendar 2010, as long as the blending credit is enacted by or before March 31, 2011.").

same principal amount ($125,000), "payable 30 calendar days following demand for payment." *See* R. 109-1 at 14 (the "Second Secured Note"). Unlike the First Secured Note, the Second Secured Note expressly imposed 18% annual interest due within 10 days following the end of each month. *Id.* Otherwise, the terms of the First and Second Secured Notes—including Ultra Green's guaranty and security agreement—were the same. *Id.* Pierce again signed the note on behalf of M1 (as President) and Ultra Green (as Managing Member). *Id.* at 15.

A week after Pierce executed the Second Secured Note, on February 22, 2011, Ultra Green paid Hepp $250,000. R. 109 ¶ 12. On that same date, the parties replaced the Second Secured Note with a third note. *See* R. 109-1 at 17-18 (the "Third Secured Note"). The Second and Third Secured Notes impose essentially the same terms with minor changes in verbiage. *Id.* Ultra Green again agreed to unconditionally guaranty M1's performance, and granted Hepp a security interest in all of its assets. *Id.* But the principal amount of the Third Secured Note is higher: $245,398 ("the present value of $250,000 as of March 31, 2011, using an 18% interest rate"). *Id.*; *see also* R. 109 ¶ 12. Hepp contends that the $250,000 figure represented the outstanding balance under the Swap Agreement ($125,000, after Ultra Green's $250,000 payment on February 22, 2011), plus the face amount of the Second Secured Note ($125,000). R. 108 at 3.

On or around June 1, 2011, M1 paid $70,398 to Hepp, its first and only principal payment. R. 109 ¶ 19. M1 also made periodic interest payments to Hepp between March 2011 and July 2012. *Id.* at ¶ 20. Since that time, M1 has not made

any interest payments. *Id.* at ¶ 21. The balance of the Third Secured Note on May 1, 2015, will be $283,876. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ANALYSIS

Hepp's breach of contract claim is straightforward. M1 promised to pay Hepp $250,000 at 18% annual interest. Hepp demanded payment in April 2013, R. 115 ¶ 25, triggering M1's 30-day deadline to pay all amounts due. M1 has not paid that sum, and Ultra Green has refused to pay Hepp as guarantor. In response to Hepp's motion for summary judgment, Ultra Green argues that it is not bound by the Third

Secured Note because: (1) the guaranty was not supported by consideration; and/or (2) Pierce exceeded his authority under Ultra Green's operating agreement.

I.   **Whether the Third Secured Note Was Supported By Consideration**

Ultra Green argues that the Third Secured Note is not binding because it was not supported by consideration. "Consideration is 'a bargained-for exchange, whereby the promisor . . . receives some benefit, or the promisee . . . suffers detriment.'" *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co., Ltd.*, 707 F.3d 853, 866 (7th Cir. 2013) (quoting *Vassilkovska v. Woodfield Nissan, Inc.*, 830 N.E.2d 619, 624 (Ill. App. Ct. 1st Dist. 2005)). The Third Secured Note recites that Ultra Green and M1 executed the note "FOR VALUE RECEIVED," R. 109-1 at 17, which creates a "presumption" that their promises were supported by consideration. *JPMorgan*, 707 F.3d at 866. The presumption is rebuttable, but only by "very clear and cogent" evidence. *Id.*

Ultra Green cites *First National Bank of Red Bud v. Chapman* in support of its argument that consideration is lacking. 366 N.E. 2d 937 (Ill. App. Ct. 5th Dist. 1977). In *First National*, the defendant's husband executed a note in favor of the plaintiff bank "renewing" the husband's existing obligations on new terms. *Id.* at 938. Five days after her husband executed the note, the defendant—at the bank's request—executed a written guaranty securing existing and future debts incurred by her husband. *Id.* at 939. In a suit filed by the bank to enforce the guaranty, the court held that the guaranty was not binding because it was not supported by consideration. "[W]here the agreement of guaranty is executed contemporaneously

with the original note or obligation, the consideration for the note or obligation furnishes sufficient consideration for the agreement of guaranty. . . ." *Id.* at 940. If the guaranty is executed after the note, however, "some additional consideration is necessary to support such promise." *Id.* The court noted that an agreement by the bank to "forebear" suing the defendant's husband would have supported her post-note guaranty. *Id.* at 941. But there was no evidence in the record supporting such an agreement or understanding, and no evidence of any other consideration. *See id.* at 941 ("The mere fact that the bank did in fact forbear is insufficient consideration if [ ] such forbearance was not pursuant to an agreement between the parties for such forbearance.").

Ultra Green concedes that Hepp's promise to pay M1 $125,000 was consideration supporting Ultra Green's "contemporaneous" guaranty in the First Secured Note. *See* R. 114 at 13 ("If Pierce had been acting with the prior unanimous written consent of Ultra Green's Members"—which it disputes—"Ultra Green would have no basis for claiming that there was a lack of consideration for" the First Secured Note.); *see also First Nat'l.*, 366 N.E. 2d at 940. It argues, however, that Hepp did not pay any additional money (or suffer any additional detriment) in exchange for the Third Secured Note. The Court disagrees. Ultra Green's $375,000 payment under the Swap Agreement was due February 15, 2015. Ultra Green paid Hepp $250,000 one week after that deadline, leaving $125,000 due and owing.[6] The

---

[6] Ultra Green half-heartedly argues that it only owed Hepp $250,000 because Hepp (as "Buyer") was unconditionally required to pay Ultra Green (as "Seller") $0.25/gallon for "500,000 gallons" of biodiesel. R. 114 at 5-6; *see also id.* at 14 ("Hepp

Third Secured Note effectively extended the due date for the balance of the swap payment to at least March 24, 2011 (30 days after the parties executed the Third Secured Note). Hepp's forbearance was sufficient consideration supporting Ultra Green's guaranty.

**II. Whether Pierce Had Actual Authority to Execute the Third Secured Note on Ultra Green's Behalf.**

Ultra Green argues that Pierce, in executing the Third Secured Note, exceeded his authority as the company's Managing Member. *See* R. 114 at 3-5; *see also* R. 117-1 ¶¶ 12-16 (Aff. of Kathy Lee Paskvan, Ultra Green's current co-Managing Member). During the relevant time period, Ultra Green had seven "Members," (including Pierce), and two "Managing Members" (Pierce and his wife, Cathy Pierce). R. 117-1 ¶ 7. Ultra Green's Operating Agreement authorized the Managing Members to conduct the company's day-to-day affairs:

> The business and affairs of the Company shall be conducted and managed by the Managing Members of the Company in accordance with this Agreement and the laws of Delaware. The Managing Members shall have responsibility for the day-to-day management of the business and affairs of the Company and shall devote such time and attention as the Managing Members deem necessary to the conduct and management of the business and affairs of the Company. No Member, other than the Managing Members or their designees, shall have the authority or shall take any action as a Member, to bind the Company.

---

and Pierce lumped the $125,000 that Ultra Green *supposedly* still owed to Hepp on the swap trade into Note 3 . . . .") (emphasis added). Hepp was only required to pay Ultra Green $125,000 "*if* the Blending Credit is not enacted retroactively for all of 2010 by March 31, 2011." R. 109-1 at 7 (emphasis added). That condition did not come to pass.

R. 111-1 at 6 ("Operating Agreement of Ultra Green Energy Services, LLC" ("Operating Agreement"), dated Oct. 1, 2007, at § 5.1 ("Management")). Members, by contrast, could only make decisions "relating to the business or affairs of the Company" with the "affirmative vote or consent of Members holding a majority of the Ownership Interests." R. 117-1 at 13 (Operating Agreement § 5.2 ("Actions by Members.")). The Operating Agreement further provided that "no Member has authority to do any of the following without the prior written consent of all other Members":

> **5.3.1** To sell, lease, exchange, mortgage, pledge, or otherwise transfer or dispose of all or substantially all of the property or assets of the Company;
>
> **5.3.2** To merge the Company with any other entity;
>
> **5.3.3** To amend the articles of organization of the Company or this agreement;
>
> **5.3.4** To incur indebtedness by the Company other than in the ordinary course of business;
>
> **5.3.5** To authorize a transaction involving an actual or potential conflict of interest between a Member and the Company;
>
> **5.3.6** To change the nature of the business of the Company; or
>
> **5.3.7** To commence a voluntary bankruptcy case for the Company.

*Id.* at 13-14.

Hepp contends that the Operating Agreement's limits on the authority of Members did not affect Pierce's authority as Managing Member. *See* R. 121 at 3-4. The Court agrees, but only to a point. Section 5.1 of the Operating Agreement authorized Pierce to enter into agreements on the company's behalf related to its

day-to-day operations. And Ultra Green appears to concede that the Swap Agreement fell within the scope of that authority. The actions requiring unanimous Member consent in § 5.3, by contrast, involve fundamental changes to the company's business. Construing § 5.1 to permit Pierce to perform those acts without Member consent would lead to absurd results. It would give Pierce the power to expand his own authority by amending the Operating Agreement, to change the nature of the company's business, to merge the company out of existence, and to sell all its assets—simply by purporting to take these actions as a "Managing Member," rather than a "Member." Vesting day-to-day control in a manager, while giving non-managing members veto power over major decisions affecting the company, is a common feature of LLC agreements. *See 2009 Caiola Family Trust v. PWA, LLC*, C.A. No. 8028-VCP, 2014 WL 1813174, *11 n. 40 (Del. Ch. Apr. 30, 2014) (collecting cases). Hepp has not cited any evidence that would support the conclusion that the parties intended to deviate so radically from that standard structure. The Court concludes that Pierce lacked authority to undertake unilaterally the actions described in § 5.3.

The Third Secured Note implicated at least two provisions requiring unanimous Member consent. Pierce purported to pledge all of Ultra Green's assets as security, *see* R. 117-1 at 13 (Operating Agreement § 5.3.1), and the transaction involved "an actual or potential conflict of interest between a Member and the Company" by virtue of Pierce's interest in M1, *see id.* at 14 (Operating Agreement § 5.3.5). Thus, Pierce needed the unanimous consent of Ultra Green's Members to

execute the Third Secured Note on the company's behalf. Three members of Ultra Green during the relevant time period state that they did not vote, and were not asked to vote, to approve the Third Secured Note. *See* R. 111 ¶¶ 21-23 (Jonathan Payne); R. 113 ¶¶ 9-11 (Michael Cooper); R. 117-1 ¶¶ 27-30 (Paskavan). The Court concludes, therefore, that Hepp is not entitled to summary judgment on the ground that Pierce had actual authority to execute the Third Secured Note on Ultra Green's behalf.

### III. Whether Ultra Green is Bound by the Third Secured Note Under the Apparent Agency Doctrine

Alternatively, Hepp argues that Ultra Green is bound by the agreement under an apparent agency theory. R. 121 at 4-5. "Apparent authority arises when (1) the principal or agent acts in a manner that would lead a reasonable person to believe the actor was an agent of the principal, (2) the principal knowingly acquiesces to the acts of the agent, and (3) the plaintiff reasonably relies on the actions of the purported agent." *See Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 732 (7th Cir. 2014).[7] "An agent's apparent authority can only be determined by evaluating the principal's conduct toward the third party. Specifically, the principal must do something to lead the third party to believe that the agent is authorized to act on its behalf." *Bethany Pharmacal Co., Inc. v. QVC, Inc.*, 241 F.3d 854, 859-60 (7th Cir. 2001) (citing *Yugoslav Am. Cultural Ctr., Inc. v. Parkway Bank & Trust Co.*, 682 N.E. 2d 401, 406 (Ill. App. Ct. 1st Dist. 1997)). "An apparent agency may

---

[7] The parties agree that this issue is governed by Illinois law, which the parties selected as the law governing the Third Secured Note. *See* R. 121 at 5; R. 123 at 2.

arise, however, 'from silence of the alleged principals when they knowingly allow another to act for them as their agent.'" *Id.* (quoting *Mateyka v. Schroeder*, 504 N.E. 2d 1289, 1295 (Ill. App. Ct. 5th Dist. 1987). "Agency is a notoriously fact-bound question, but summary judgment on the existence of an agency relationship is still appropriate when the plaintiff fails 'to meet her burden in presenting sufficient facts to show that a genuine issue of material fact exists with respect to the agency issue.'" *Spitz*, 759 F.3d at 731 (quoting *Wilson v. Edward Hosp.*, 981 N.E. 2d 971, 978 (Ill. 2012)).

The Court is not persuaded that the record establishes Pierce's apparent agency as a matter of law. Hepp raised his apparent-agency theory for the first time in his reply brief, *see* R. 121 at 4-5, and Ultra Green addressed it in a brief sur-reply, R. 123 at 2-4. Neither party has adequately developed the issue, legally or factually. Hepp relies on the following provision of the Illinois Limited Liability Company Act ("ILLCA") pertaining to apparent agency in manager-managed companies:

> A member is not an agent of the company for the purpose of its business solely by reason of being a member. Each manager is an agent of the company for the purpose of its business, and an act of a manager, including the signing of an instrument in the company's name, for apparently carrying on, *in the ordinary course*, the company's business or business of the kind carried on by the company binds the company, unless the manager had no authority to act for the company in the particular matter and the person with whom the manager was dealing knew or had notice that the manager lacked authority.

805 ILCS 180/13-5(b)(1) (emphasis added). There are at least two problems with Hepp's argument. First, the ILLCA governs *Illinois* limited liability companies, and

Ultra Green was organized under Delaware law. Assuming that Illinois law is controlling, *see supra* n. 7, the common law of agency and contract appears more apt. Hepp has not cited any cases applying common law apparent agency to analogous facts. Second, as the Court just discussed in connection with Hepp's actual-agency argument, there is a material factual dispute regarding whether the Third Secured Note constituted an "ordinary course" transaction.[8] Applying Illinois common law, and viewing the evidence in the light most favorable to Ultra Green, there is a material factual dispute regarding whether Hepp reasonably relied on Pierce's representation "that he had authority to act on behalf of M1 Energy and Ultra Green." R. 109 ¶ 4; *see Spitz*, 759 F.3d at 732. In exchange for a short extension of its obligation to pay $125,000, Ultra Green shouldered an additional $125,000 of debt, at 18% interest, secured by all of its assets. Also, Hepp knew that Pierce had executed the Third Secured Note on behalf of M1 *and* Ultra Green. He has not cited any evidence indicating that someone affiliated with Ultra Green (the principal), other than Pierce, led Hepp to believe that Pierce was authorized to enter into an agreement creating a readily apparent conflict of interest. *See Bethany Pharmacal*, 241 F.3d at 859-60 ("[T]he scope of the apparent agent's authority is determined by the authority that a reasonably prudent person might believe the

---

[8] The ILLCA goes on to state the effect of an action that is *not* apparently in the ordinary course, but Hepp has not cited that provision or attempted to apply it. *See id.* at 180/13-5(b)(2) ("An act of a manager which is not apparently for carrying on, in the ordinary course, the company's business or business of the kind carried on by the company binds the company only if the act was authorized under Section 15-1."); *see also Costello v. Grundon*, 651 F.3d 614, 639 n.7 (7th Cir. 2011) ("'It is not the responsibility of this court to make arguments for the parties.'") (quoting *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir.1999).

agent to possess based on the actions of the principal."); *see also Malcak v. Westchester Park Dist.*, 754 F.2d 239, 245 (7th Cir. 1985) ("A third party dealing with an agent has the obligation to verify both the fact and extent of the agent's authority."). In his opening brief, Hepp argued that Ultra Green (through Pierce) "ratified" the transactions by making payments on the Third Secured Note. R. 108 at 7. But Pierce made those payments on M1's behalf. *See* R. 109 ¶¶ 19-20. Three Members of Ultra Green have submitted affidavits in support of the company's response to Hepp's summary-judgment motion stating that they did not learn about the existence of the Secured Notes until early 2013. *See* R. 111 ¶¶ 18, 20 (Payne, a Member of Ultra Green and its Director of Operations during the relevant time period, did not learn about the Secured Notes until Hepp sent him copies in January 2013.); R. 113 ¶ 7 (Cooper, an Ultra Green Member and the company's Sales Manager during the relevant time period, did not learn about the Secured Notes until April 2013.); R. 117-1 ¶ 17 (Paskavan, a Member of Ultra Green during the relevant time period, also learned about the notes in April 2013). The fact that Pierce belatedly disclosed those obligations to Ultra Green's Members in April 2013 before selling his interest in the company does not somehow ratify the transaction. *Cf.* R. 109 ¶ 22. Likewise, Pierce's subjective belief that Hepp has a "valid claim" does not make it so. *Id.* In sum, the Court concludes that material factual disputes preclude summary judgment.[9]

---

[9] The Court rejects Ultra Green's invitation to require Hepp to "show cause" why the Court should not grant summary judgment in its favor. *See* R. 123 at 4 n.1. For

## CONCLUSION

For the foregoing reasons, the Court denies Hepp's motion for summary judgment, R. 107. The Court sets a status hearing for May 6, 2015 at 9:00 a.m.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: April 28, 2015

---

reasons the Court has already discussed, factual issues preclude summary judgment in favor of either party.