UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CURT HEPP, | ) | |
| | ) | No. 13 C 4692 |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| ULTRA GREEN ENERGY SERVICES, LLC AND | ) | |
| M1 ENERGY RISK MANAGEMENT, LLC, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**MEMORANDUM OPINION AND ORDER**

On April 28, 2015, the Court denied plaintiff Curt Hepp's motion for summary judgment on its claim that defendant Ultra Green Energy Services, LLC ("Ultra Green") breached its agreement to guaranty co-defendant M1 Energy Risk Management, LLC's ("M1") obligations under a secured note. *See* R. 127 (*Hepp v. Ultra Green Energy Services, LLC*, No. 13 C 4692, 2015 WL 1952685 (N.D. Ill. Apr. 28, 2015)). Hepp then amended his complaint to assert, in the alternative, a claim against Ultra Green for breach of a prior biodiesel financial swap agreement (the "Swap Agreement") between Hepp and Ultra Green. R. 132 ¶¶ 49-53 (Count III). Ultra Green has moved to dismiss Count III, arguing that it does not state a claim for relief because the secured note superseded the Swap Agreement. For the following reasons, the Court denies Ultra Green's motion to dismiss.

**BACKGROUND**

The Court will assume that the reader is familiar with its April 28, 2015 memorandum opinion. Nevertheless, a brief overview of the relevant facts will be

1

helpful. Under the terms of the Swap Agreement, Ultra Green agreed to pay Hepp $375,000 if the United States government adopted a biodiesel blending credit by March 31, 2011; Hepp, in turn, agreed to pay Ultra Green $125,000 if the government did *not* approve the credit by that date. R. 132 ¶ 9. Pierce executed the Swap Agreement on Ultra Green's behalf as its Managing Member. *Id*. As the Court noted in its prior opinion, *see Hepp*, 2015 WL 1952685, at *5, Ultra Green appears to concede that Pierce had authority under the company's Operating Agreement to execute the Swap Agreement on the company's behalf.

As security for his contingent liability under the Swap Agreement, Hepp agreed to pay $125,000 to M1, a company that Pierce owned and that was "related to Ultra Green." R. 132 ¶ 10; *see also Hepp*, 2015 WL 1952685, at *1 (M1 had a 5% ownership interest in Ultra Green at that time). In exchange for this payment, M1 (as "Borrower") promised to pay Hepp (as "Lender") $125,000 on May 31, 2011 (the date on which Hepp would be required to pay Ultra Green under the Swap Agreement if the government did not adopt the fuel credit before the deadline). R. 132 ¶12. The parties memorialized their agreement in a promissory note dated October 8, 2010 (the "First Secured Note"). *Id*. Ultra Green "unconditionally guaranteed" M1's obligations under the Note, *id*. ¶ 13, and granted Hepp a security interest in "all assets and receivables of" Ultra Green. R. 132-2 at 2. Pierce signed the note on behalf of M1 (as President) and Ultra Green (as Managing Member). *Id*. at 3.

2

On or about December 17, 2010, President Obama signed H.R. 485, the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010 (P.L. No. 111-312). R. 132 ¶ 14. The Act extended and reinstated several alternative fuel tax credits through December 31, 2011, including the biodiesel blending credit. *Id.* So, under the terms of the Swap Agreement, Ultra Green became obligated to pay Hepp $375,000 by February 15, 2011 (60 days after the Act became law). *Id.*[1]

On the day that Ultra Green's $375,000 payment was due, the parties "replaced" the First Secured Note with a new note in the same principal amount ($125,000), "payable 30 calendar days following demand for payment" (the "Second Secured Note"). *Id.* ¶¶ 15-18. The Second Secured Note imposed 18% annual interest payable monthly. *Id.* ¶ 17. Otherwise, the terms of the First and Second Secured Notes—including Ultra Green's guaranty and security agreement—were the same. *Id.* ¶ 18. Pierce again signed the note on behalf of M1 and Ultra Green (as Managing Member). *Id.* ¶ 21.

A week after Pierce executed the Second Secured Note, on February 22, 2011, Ultra Green paid Hepp $250,000. *Id.* ¶ 22. On that same date, the parties replaced the Second Secured Note with a third note (the "Third Secured Note"). *Id.* ¶ 23. The Third Secured Note contained largely the same terms as the Second Secured Note.

---

[1] Hepp re-alleges in his second amended complaint that the due date was March 31, 2015. R. 132 ¶ 14. The Court has held, however, that "Ultra Green's liability was triggered if the government reinstated the tax credit before [March 31, 2015], but *payment* was due 60 days after reinstatement." *Hepp*, 2015 WL 1952685, at *2 n.5 (citing R. 109-1 at 7 ("Seller shall pay to Buyer the amount of Seller's obligation on or before 60 days following the reinstatement of the US Biodiesel Blending Credit retroactively for all of calendar 2010, as long as the blending credit is enacted by or before March 31, 2011.")).

3

*Id*. The principal amount of the Third Secured Note, however, was higher: $245,398 ("the present value of $250,000 as of March 31, 2011, using an 18% interest rate"). *Id*. Hepp alleges that the $250,000 figure represented the outstanding balance under the Swap Agreement ($125,000, after Ultra Green's $250,000 payment on February 22, 2011), plus the face amount of the Second Secured Note ($125,000). *Id*. Ultra Green, acting through Pierce, again agreed to unconditionally guaranty M1's performance, and granted Hepp a security interest in all of its "assets and receivables. *Id*. ¶¶ 25, 28.

On or about June 1, 2011, M1 paid $70,398 to Hepp, its first and only principal payment. *Id*. ¶ 29. Hepp demanded payment of the full principal amount in March 2012. *Id*. ¶ 31. M1 did not (and has not) paid Hepp and has stopped making interest payments. *Id*. ¶¶ 30-31. Ultra Green has refused to honor the guarantee. *Id*. ¶ 32.

## LEGAL STANDARD

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels

4

and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

## ANALYSIS

In its opinion denying Hepp's motion for summary judgment, the Court held that there were genuine disputes of material fact about whether Pierce exceeded his authority under Ultra Green's Operating Agreement when he executed the Third Secured Note on the company's behalf. *Hepp*, 2015 WL 1952685, at *6. If the Court finds that Pierce *did* exceed his authority, Hepp claims that Ultra Green is still liable for breach of the Swap Agreement:

> In the event this Court finds the Ultra Green guarantee of the [Third Secured Note] to be invalid, Plaintiff asserts this claim for breach of contract against Ultra Green, and seeks the $125,000 due and owing on the trade, plus pre-judgment interest since February 15, 2011.

R. 132 ¶ 53.

Ultra Green argues that the Third Secured Note extinguished the Swap Agreement, citing the "merger" doctrine:

5

> The doctrine of merger provides that where a subsequent contract is executed which relates to the same subject matter and embraces the same terms as a previous contract, then actions by the parties, based upon a contract, must be based upon the provisions of the subsequent contract. The first contract is said to have merged into the subsequent contract covering the same matters.

*First United Leasing Corp. v. Campagnie Nationale Air Fr.*, No. 95 C 2743, 1995 WL 560918, at *4 (N.D. Ill. Sept. 18, 1995) (citing *Kraft v. No. 2 Galesburg Crown Fin. Corp.*, 420 N.E.2d 865, 870 (Ill. Ct. App. 3d Dist. 1981)); *see also* R. 136 at 6. Ultra Green also argues that the Third Secured Note "modified" the Swap Agreement, so that any lawsuit to enforce the parties' agreement "must be brought on the modified agreement and not the original agreement." *Schwinder v. Austin Bank of Chi.*, 809 N.E.2d 180, 189 (Ill. Ct. App. 1st Dist. 2004); *see also* R. 136 at 6-7.

The cases Ultra Green cites do not address how the merger doctrine applies when one of the parties to the later contract contends that it is invalid (in whole or in part). It is apparent that Hepp was unwilling to accept M1's promise to pay him without Ultra Green's guaranty, further secured by a security interest in Ultra Green's assets. Under the circumstances, the Court questions whether the Third Secured Note, stripped of Ultra Green's guaranty, would "embrace[] the same terms" as the Swap Agreement. *See Alton Banking & Trust Co. v. Schweitzer*, 460 N.E.2d 105, 108 (Ill. Ct. App. 5th Dist. 1983) ("Even where merger might be expected to occur, it will fail if the second contract does not satisfy all the terms of the original agreement."); *cf. Kraft*, 420 N.E.2d at 867 (court stated that it would have "no difficulty" concluding that a note was merged into a subsequent note containing identical terms except for the word "estimated"). Indeed, it would be a

6

strange result if Ultra Green could, through the *ultra vires* act of its Managing Member, avoid its obligations under the Swap Agreement, a contract that he apparently had authority to execute on the company's behalf.

Besides being underdeveloped, Ultra Green's motion is also premature. The Swap Agreement's enforceability is relevant only if the Court decides after trial that Pierce lacked authority to execute the Third Secured Note on Ultra Green's behalf. At that point, the Court will have a fully developed factual record, which may shed light on the circumstances surrounding these transactions and on the parties' intent.

## Conclusion

For the foregoing reasons, the Court denies Ultra Green's motion to dismiss Count III of Hepp's second amended complaint, R. 136.

ENTERED:

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: August 4, 2015