| | | |
|---|---|---|
| CURT HEPP, | ) | |
| | ) | No. 13 C 4692 |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| ULTRA GREEN ENERGY SERVICES, LLC, | ) | |
| | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Ultra Green Energy Services LLC ("Ultra Green") moves this Court for a new trial pursuant to Rule 59(a) or for an order altering or amending its judgment pursuant to Rule 59(e). For the reasons set forth below, Ultra Green's motion is denied.

## Procedural History

This is a long-pending and vigorously litigated case with which the Court has become exceedingly familiar. The original complaint was filed nearly three years ago, on June 27, 2013. R. 1. After extensive motion practice on the pleadings that spanned roughly a year and half and culminated in three separate orders, *see* R. 61, R. 93, R. 94, the Court entertained what were essentially cross-motions for summary judgment in early 2015, *see* R. 107 – R. 123. Having studied the record developed in discovery and the parties' well-articulated legal arguments, on April 28, 2015, the Court found that a material factual dispute existed regarding whether

third-party defendant Robert "Jay" Pierce had apparent authority to enter into the biodiesel financial swap at issue in this case. R. 127 at 15.

Proceeding on a judicially-upheld second amended complaint, *see* R. 132 (Operative Complaint), R. 144 (Order Denying Motion to Dismiss the Second Amended Complaint), with the benefit of 32 factual stipulations, R. 150, and thorough pre-trial briefing by the parties, R. 151, R. 152, a two-day bench trial was held in late August 2015, R. 156, R. 157. The trial record included the above-mentioned stipulations, testimony from six witnesses, more than 30 exhibits (several of which were jointly submitted), and dozens of pages of attorney argument memorialized in the trial briefs and transcript, R. 169, R. 170. Based on this evidence, and having had the opportunity to make credibility determinations at trial, the Court, in an oral ruling, found by a preponderance of the evidence that Pierce did have apparent authority under Illinois law to execute the swap agreement on Ultra Green's behalf. *See* R. 160 (Tr. of Oral Ruling). The Court thus entered judgment in favor of Plaintiff Curt Hepp in the amount of $402,199.00 (the amount owing on the swap plus agreed-upon costs and reasonable fees). R. 158, R. 160, R. 161.

Defendant has filed a post-trial motion for a new trial or an order altering or amending the judgment.

## Legal Standard

A court may grant a new trial "after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Fed. R.

Civ. P. 59(a)(1)(B). Furthermore, a court may "open the judgment if one has been entered . . . amend findings of fact and conclusions of law or make new ones, and direct the entry of judgment." Fed. R. Civ. P. 59(a)(2). In determining whether to grant a new trial or open the judgment for reconsideration, the court's findings of fact are entitled to great deference, particularly when the court has the benefit of making credibility determinations at a contested hearing or trial. *See Ortiz v. Martinez*, 2014 WL 1409446, at *2 (N.D. Ill. Apr. 11, 2014) (citing *Levenstein v. Salafsky,* 414 F.3d 767, 773 (7th Cir. 2005); *Gaffney v. Riverboat Servs. of Ind., Inc.,* 451 F.3d 424, 447-48 (7th Cir. 2006); *Carnes Co. v. Stone Creek Mech., Inc.,* 412 F.3d 845, 848 (7th Cir. 2005) ("a trial court's credibility determination can virtually never amount to clear error.")).

A party may also move to alter or amend a judgment to correct a "manifest error of law or fact." Fed. R. Civ. P. 59(e); *see also Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012). The Seventh Circuit has made clear that Rule 59(e) is not to be used as a vehicle to "advance arguments that could and should have been presented to the district court prior to the judgment." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 954 (7th Cir. 2013) (quotation and citation omitted). Instead, the court has interpreted the rule to reserve reconsideration for situations in which the court "has patently misunderstood a party" or has made a legal error based on inadvertence or misapprehension. *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191-92 (7th Cir. 1990) (quotation and citation omitted). Because there is a presumption that judgments are final,

reconsideration is granted under Rule 59(e) only in the rare circumstance where the moving party has shown that there is good reason to set the judgment aside. *Id.*; *see also Hecker v. Deere & Co.*, 556 F.3d 575, 591 (7th Cir. 2009).

## Factual Background

The facts found by the Court at trial and their basis in the record are set forth below. Most of the material facts in this case were jointly stipulated to or are plain on the face of jointly submitted exhibits. The remainder, by-and-large, were consistently presented across witnesses. The Court has also taken judicial notice of the Ultra Green website as archived on the Wayback Machine in 2011.[1]

### A.    The Parties

Ultra Green was formed in late 2007 by William Paskvan. R. 117-1 (Joint Ex. 11). Its business was to buy and sell biodiesel fuels. *Id.* Although Paskvan testified that Ultra Green was his company, he put his portion of the ownership of the company in the hands of his wife, Kathy Paskvan, given his chronic health issues. R. 170 at 325. Mrs. Paskvan testified that she knew little or nothing about the operation of the business, and that her role was that of a nominal owner in name only. R. 169 at 114-17.

Paskvan recruited Pierce and his wife Cathy Pierce to be the sole managing members of Ultra Green. R. 170 at 322. By the terms of the company's operating

---

[1] "Courts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, *see* Fed.R.Evid. 201." *Erickson v. Nebraska Mach. Co.*, 2015 WL 4089849, at *1 (N.D. Cal. July 6, 2015) (collecting authority).

agreement, the Pierces were delegated full responsibility for the day-to-day management of the business affairs of the company. *See* R. 117-1. The "Who We Are" webpage of Ultra Green's website listed Pierce as a "Managing Member" and "Director of Risk and Finance," detailing his "extensive background in financial risk management, option strategies, trading, and capital financing." *See* https://web.archive.org/web/20120810033536/http://www.ugesllc.com/?c=whoweare (last visited March 7, 2016). The website furthermore directed all business and finance-related inquiries for Ultra Green to Pierce's company e-mail address, jay@ugesllc.com. *Id.*

There is no dispute that Pierce managed Ultra Green's finances, and that his responsibilities included executing hedging transactions that were essential to the operation of the company. *See* R. 169 at 116, 156-57, 160-64, 172-76, 197; R. 170 at 220, 311. Pierce was afforded a significant amount of leeway in this role, acting with little oversight and rarely, if ever, seeking permission from other members of Ultra Green to engage in business and financing transactions on the company's behalf. *See* 169 at 166, 196; 170 at 364-65. Indeed, on more than occasion, Pierce signed guarantees pledging corporate assets without the knowledge or consent of other members in order to raise operating capital for the company. R. 169 at 158-59; R. 170 at 225. As Jonathan Payne, a (non-managing) member of Ultra Green and the company's Director of Operations, testified, "Mr. Pierce and Ms. – Mrs. Pierce were the financial leaders of the company. . . I had zero input or, you know, control

5

over any financial, banking, financing things of any kind. That was totally their responsibility." R. 170 at 311.

And this arrangement satisfied Ultra Green's members, who received "sustainable" monthly payments from Ultra Green "and were quite happy that this business that [they] were running and operating was cash-flowing." R. 170 at 380. Indeed, the Paskvans "congratulated the Pierce family off of the good work they were doing on [the members'] behalf . . . [s]o we really didn't have any question [about their financial management of the company]." *Id.* Paskvan testified that despite having unobstructed access to the company's bank statements (Mrs. Paskvan was a cosigner on the account), he never so much as requested much less reviewed a single corporate bank statement from the time of Ultra Green's formation in 2007 to just before the initiation of this lawsuit in 2013. *Id.* at 366-68. Instead, the members of Ultra Green were content to receive periodic accounting review reports with disclaimers such as "[a] review is substantially less in scope than an audit," Pl. Ex. 17, and "[m]anagment has elected to omit substantially all of the disclosures required by accounting principles accepted in the United States of America. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the Company's financial position," Pl. Ex. 23; R. 170 at 313, 379-80.

During the entire period Pierce acted as Ultra Green's managing member, he was also the majority owner and president of M1 Energy ("M1"), a fact disclosed in the biography for Pierce appearing on Ultra Green's website. R. 150 ¶¶ 10-11; *see*

*also* "Who We Are," *available at* https://web.archive.org/web/20120810033536/
http://www.ugesllc.com/?c=whoweare. Ultra Green held a one percent interest in
M1, and M1 held a five percent interest in Ultra Green. R. 170 at 236-37, 331. In
the early years of Ultra Green's operation, M1 provided financing for Ultra Green's
"day-to-day" expenses. R. 169 at 155-56, 184-85; R. 170 at 375-76, 385 ("In the
beginning, M1 Energy Risk Management, LLC, which is owned and controlled by
Robert Pierce, provided financing to UGES for purchasing biodiesel."); Pl. Ex. 21
(prepared by Payne).

## B.    The Transaction(s)

Ostensibly to hedge Ultra Green's possible losses on a then-pending federal
biodiesel blending tax credit, Pierce entered into a biodiesel financial swap
agreement with Hepp on September 24, 2010. R. 53-1; *see also* R. 169 at 179-81
(describing the origin and strategic value of the transaction). The biodiesel financial
swap agreement read, in relevant part, as follows:

> If USA passes blending credit retroactively for all of calendar 2010 on
> or before March 31, 2011 for a blending credit of $1 per gallon, [Ultra
> Green] shall pay US $375,000 to [Curt Hepp]. If USA does not pass
> biodiesel blending credit by March 31, 2011 retroactively for all of
> calendar 2010, [Curt Hepp] shall pay US $125,000 to [Ultra Green].

R. 53-1; R. 150 ¶ 21.

The agreement was brokered by a third party, Al Pollard of IVG Energy,
Limited ("IVG Energy"). *Id.* Hepp had used IVG Energy as a broker on a number of
other successful commodities trades and had himself entered into three similar
legislation-triggered financial swaps in the course of his twenty-five year trading
career. R. 169 at 42-44, 52. (discussing past commodities trades brokered by IVG

Energy and other legislation-triggered swap deals, including one brokered by IVG Energy). He described this swap as typical in all aspects. R. 169 at 41-42.

The record establishes that neither Hepp nor Pierce did much in the way of due diligence on the other, both apparently relying on Pollard, the broker, to examine the legitimacy of the deal. *See* R. 169 at 57-58, 181. This was consistent with longstanding industry practice. *See* R. 169 at 56-59 (describing, in detail and based on twenty-five years of experience, the typical diligence done by brokers and traders in advance of transactions like this one). And though Hepp testified that he could not recall for certain whether he checked Ultra Green's website to confirm Pierce's authority to sign the swap and guarantee, he stated unequivocally that he understood at the time of the transaction, either from reviewing the website, company documents, or both, that Pierce was an owner and managing member of Ultra Green. R. 150 ¶¶ 8-9; R. 169 at 59. It was furthermore Hepp's understanding that Pierce was the owner and president of M1 Energy and that M1 Energy provided financing to Ultra Green. R. 150 ¶¶ 10-11; R. 169 at 69.

As strangers brought together by Pollard for this deal, both Pierce and Hepp demanded security on the agreement. *See* R. 169 at 49-56, 184-85. This, too, was standard industry practice. *Id.* On October 5, 2010, Pierce signed a Secured Note (Hepp Note 1) on behalf of M1 Energy "unconditionally promis[ing] to pay to the order of Curt Hepp . . . the principal sum of One Hundred Twenty Five Thousand Dollars and 00/100." R. 150 ¶¶ 2, 6-7, 10-11; R. 53-2. Furthermore, Hepp Note 1 provided that "Ultra Green Energy Services, LLC (Guarantor) hereby grants a

security interest to [Hepp] of all assets and receivables of Guarantor as security on this note and agrees to perfect such security interest if requested by [M1 Energy] in the event of a default." R. 150 ¶¶ 5, 8-9, 12-14; R. 53-2. Pierce signed this guarantee as the managing member Ultra Green. *Id.* To secure his end of the bargain, on or about October 27, 2010, Hepp wired the present-value of his $125,000 obligation under agreement to M1. *See* Pl. Ex. 4; R. 169 at 71-72.

On December 17, 2010, President Obama signed H.R. 485, the Tax Relief, Unemployment Insurance, and Job Creation Act of 2010, which included a retroactive biodiesel blending credit of $1.00 per gallon. R. 150 ¶ 22. Accordingly, Ultra Green became obligated to Hepp in the amount of $500,000 ($375,000 as provided in the swap agreement plus the $125,000 sent by Hepp to M1 Energy as security).

On February 15, 2011, Pierce signed a Secured Note to Hepp for $125,000 on behalf of M1 Energy ("Hepp Note 2"). R. 53-3; R. 150 ¶ 3. Again, as the managing member of Ultra Green, Pierce unconditionally guarantied the note against all of Ultra Green's assets in the case default by M1 Energy. *Id.*; R. 150 ¶¶ 3, 5, 14. On February 22, 2011, Pierce directed a wire transfer of $250,000 from Ultra Green's account to Hepp in settlement of Hepp Notes 1 and 2. R. 150 ¶ 23.

On February 25, 2011, Pierce signed another Secured Note to Hepp on behalf of M1 Energy ("Hepp Note 3") for $245,398—the present value of the amount owing on the swap—at an interest rate of 18%. R. 53-4; R. 150 ¶¶ 4, 5, 24-28. As he did

with Hepp Notes 1 and 2, Pierce guarantied Hepp Note 3 against all of Ultra Green's assets. R. 150 ¶ 14, 26.

On June 1, 2011, M1 Energy paid $70,398 in principal on Hepp Note 3. R. 150 ¶ 29. For roughly a year thereafter, M1 Energy made monthly interest payments on Hepp Note 3. *Id.* ¶ 30.

In early 2012, Hepp was introduced to Ultra Green's Director of Sales and Trading, Michael Cooper, at a biodiesel industry conference. Hepp and Cooper discussed the swap Hepp had done with Pierce and Ultra Green. *See* R. 169 at 85. Apparently aware of the deal, Cooper "told [Hepp] that it was a good trade for both sides." *Id.*

Shortly thereafter, however, interest payments on Hepp Note 3 stopped. *Id.* at 86; *see also* R. 150 ¶ 31. In August 2012, after receiving partial interest payments for June and July and none for August, Hepp demanded full payment on the note from M1 Energy. *Id.* at 86-87. Payment was not made. In early 2013, Hepp contacted Cooper about seeking payment from Ultra Green as the guarantor on the note. *Id.* at 88. Cooper referred Hepp to Payne, who, after some time and research, informed Hepp that Ultra Green would not be honoring the guarantee. *Id.*; *see also* Pl. Ex. 19. This lawsuit followed.

### Legal Analysis

The Court found, and neither party now disputes, that Pierce lacked actual authority under Ultra Green's operating agreement to sign the guarantees without the written consent of Ultra Green's members. R. 160 at 14-15 (no express authority), 16 (no implied authority). The only question with which the Court and

this motion is concerned, then, is whether the trial record supports a finding that Pierce had apparent authority, thus entitling Hepp to a full recovery.

The law of apparent authority in Illinois is long-settled and was thoroughly set forth in this Court's oral ruling:

> The party asserting an agency has the burden of proving its existence . . . An agent's apparent authority is that authority which the principal knowingly permits the agent to assume or which he holds his agent out as possessing. It is the authority that a reasonably prudent man, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. The agent's authority must be derived from some act or statement of the *principal*.

R. 160 at 19 (quoting *Lundberg v. Church Farm, Inc.*, 502 N.E.2d 806, 813 (Ill. App. Ct. 2d Dist. 1986) (internal quotation marks and citations excluded) (emphasis in original)). In reaching its decision in this matter, the Court analogized the facts of this case to the facts of three others—*Lundberg*, *Progress Printing Corporation v. Jane Byrne Political Committee*, 601 N.E.2d 1055, 1067 (Ill. App. Ct. 1st Div. 1992), and *Wilmott v. Federal Street Advisors, Inc.*, 2008 WL 2477507, at *7-9 (N.D. Ill. June 17, 2008). *See* R. 160 at 17-31. The Court again adopts its analysis and application of those cases here.

Ultra Green advances three reasons why the Court's judgment was erroneous. First, Ultra Green argues that because its non-managing members were unaware of the biodiesel financial swap at the time it was entered, a finding of apparent authority constitutes "a manifest error of law." Second, Ultra Green argues that Hepp's failure to thoroughly inquire as to Pierce's authority to execute a guarantee precludes a finding in his favor as a matter of law. Finally, Ultra Green

argues that it was improper for the Court to conclude on the facts in the trial record that Ultra Green endowed Pierce with apparent authority or that Hepp's reliance on Pierce's authority was reasonable. Each of these assertions is addressed, in turn, below.

## 1.      Ultra Green's Knowledge

Ultra Green argues that because its members were not informed of the biodiesel financial swap agreement at the time it was executed, there can be no finding of apparent authority. *See* R. 172 at 11-12; R. 178 at 4 ("[i]n order for Hepp to establish apparent authority, he was required to prove that Ultra Green's principals knew and consented to Pierce's execution of the guaranty"). There is no such requirement in the case law.

Puzzlingly, in support of this argument, Ultra Green first cites *Phillips v. Community Center Foundation and the Children's Farm*, 606 N.E.2d 447 (Ill. App. Ct. 1st Dist. 1992). *Phillips* considered a ranch owner's liability for a horse-back riding injury sustained by a visitor on a property who was given permission to ride by the ranch groundskeeper, an employee. The groundskeeper did not first ask the owner's permission before allowing this particular visitor to ride, but rather granted the visitor permission based on his practice, of which the owner was aware, of allowing other visitors he invited to the property to ride the owner's horses from time to time. The ranch owner moved for summary judgment arguing that the groundskeeper lacked apparent authority to permit the later-injured visitor to ride.

Reversing the trial court's order granting summary judgment, the court of appeals found that "a reasonable person could conclude that [the owner] had acquiesced in [the groundskeeper]'s practice of permitting others to ride the horses and that [the groundskeeper] had apparent authority to do so." *Id.* at 450-51. This, of course, runs directly contrary to Ultra Green's contention that specific knowledge of the contested conduct is required to sustain a finding of apparent authority. Instead, Illinois law as applied in *Phillips* recognizes that apparent authority for a particular act may flow from a principal's general knowledge of and acquiescence to the routine conduct of its agent on its behalf. The *Phillips* case thus supports the Court's finding that, having exercised a great deal of freedom to engage in a variety of financing and hedging transactions on Ultra Green's behalf (and without oversight, review, or objection), Pierce had apparent authority to enter the biodiesel financial swap agreement, the non-managing members' unawareness of that particular transaction notwithstanding.

In further support of its argument, Ultra Green cites *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 759 N.E.2d 174 (Ill. App. Ct. 2d Dist. 2001), as being "analogous to the present case." R. 178 at 5. *Amcore* involved the incapacity of a wealthy businessman, Thomas Conley, and the question of who had authority to conduct business on behalf of his trust. Conley was the original trustee and Grand Premier Bank was designated to succeed him in the event of his incapacity. The trust documents provided that the trustee had the authority to pledge trust assets for Conley's business debts. Contemporaneously with the establishment of the trust,

Conley executed a durable power of attorney naming his wife and son Kristopher as his attorneys-in-fact. The lawyer who executed both the trust documents and the durable power of attorney testified that the power of attorney was not intended to modify the trust provision granting the trustee the authority to pledge trust assets for corporate debts.

In 1994, when Conley fell ill and was admitted to a nursing home, Grand Premier assumed trusteeship. Sometime thereafter, Kristopher signed a loan agreement, purportedly pursuant to his authority as his father's attorney-in-fact, pledging trust assets for a business debt. Affirming the invalidation of the guarantee, the appellate court explained:

> [Conley's] prior actions showed an unmistakable intent to give the authority [to pledge trust assets for debt] to his trustee and not to Kristopher. [The plaintiff] was aware that Conley was disabled that this assets were held in trust, yet [he] never asked to look at the trust documents nor asked the trustee to sign the guarantee.

*Id.* at 184. It is on this holding that Ultra Green relies in arguing error.

Ultra Green's reliance is misplaced. It was not the trustee's lack of knowledge of the particular guarantee Kristopher signed that rendered the guarantee invalid. Rather, it was the absence of any indication by the trustee that Kristopher had authority to bind the assets of the trust. *Id.* at 183 ("There is simply no evidence that Conley ever consented to or knowingly acquiesced in Kristopher's signing guarantees.") Even if Grand Premier had known of the transaction, then, Kristopher *still* would have lacked apparent authority to execute the guarantee on the trust's behalf.

Here, however, Ultra Green unequivocally manifested a broad delegation of authority to Pierce to conduct financial and risk management affairs. It did so by virtue of the representations on the company website, pursuant to the unambiguous terms of the company operating agreement, and as a matter of course in the company's day-to-day banking and business practices. That Ultra Green's members were unaware of the specific transaction at issue is of no moment. *Amcore* does not require a principal to be knowledgeable of the particulars of its agent's business for apparent authority to attach. Indeed, *Amcore* is altogether unconcerned with the issue of a principal's knowledge. What *Amcore* holds is that a principal must consent to or knowingly acquiesce in it agent's conduct to endow him with apparent authority upon which third parties may reasonably rely. *See id.* at 183. This rule is consistent with the Court's judgment.

## 2.    Hepp's Diligence

Ultra Green also argues that Hepp's failure to engage in reasonable diligence precludes a finding of apparent authority. *See* R. 172 at 8; R. 178 at 5. In support of this position, Ultra Green relies primarily on a case applying the common law of New York, *General Overseas Films, Ltd. v. Robin International, Inc.*, 542 F. Supp. 684 (S.D.N.Y. 1982). Imposing a somewhat greater burden on third parties than the common law of Illinois, "[t]he general rule in New York is that one who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority." *Id.* at 688 (internal quotation marks and citation omitted); *compare with Progress Printing Corp.*, 601 N.E.2d at 1067 (explaining that

under Illinois law, third parties have a duty to exercise *"reasonable* diligence" to verify an agent's authorization to enter contracts on behalf of its principal, though that duty does not obviate the principal's own obligation to monitor its agent's activities) (emphasis in original). But even evaluated against the more exacting burden in New York law, the record still supports the Court's conclusion that Hepp exercised reasonable diligence under the circumstances of this case.

In *General Overseas Films*, Nicholas Reisini, a filmmaker and the principal of Robin International ("Robin"), asked his longtime acquaintance, fellow filmmaker and principal of General Overseas Films, Ltd. ("GOF") Robert Haggiag, for a $500,000 loan to settle various encumbrances on a construction project. Haggiag obliged and GOF made the loan to Robin subject to various interest and repayment terms. After several requests for extension on repayment, Reisini introduced Haggiag to Charles Kraft, the Vice President and Treasurer of The Anaconda Company ("Anaconda"), who represented that Anaconda would guaranty Robin's debt. Haggiag agreed to the arrangement and Kraft executed a guarantee. Reisini and Kraft were indicted for fraud shortly thereafter and Robin was declared insolvent. GOF thus sought to recover from Anaconda as the guarantor.

GOF argued that Kraft had apparent authority to execute the guarantee because Anaconda placed Kraft in a high and visible corporate position with broad powers over financial affairs, gave him corporate stationary and business cards displaying his corporate titles, provided him with office space in the company's executive suite, and announced to the financial community through its officers and

publications that Kraft was the individual at Anaconda with whom to discuss the company's financial needs. *Id.* at 689. GOF also argued that even if Haggiag had inquired further into Kraft's authority, he would not have discovered anything casting doubt on the propriety of the transaction. *Id.* at 690. But the court ultimately determined that GOF's reliance on Kraft's authority was unreasonable:

> GOF's arguments would have force in a situation that fell within the range of transactions in which companies like Anaconda normally engage . . . [T]he nature of the specific transaction—a guarantee by Anaconda of the debt of an unrelated corporation—was extraordinary and thus sufficient to require inquiry by GOF before it relied on Kraft's purported authority.

*Id.* at 690-91. Ultra Green seizes on this language to argue that given the nature of the transaction—a guarantee by Ultra Green of the debt of M1 Energy[2]—Hepp's failure to make a thorough inquiry precludes a finding of reasonableness. R. 72 at 3. But this misses the very crux of the logic underscoring the holding in *General Overseas*. Crystalizing its point, the court continued:

---

[2] Ultra Green also cites *Yugoslav-American Cultural Center, Inc. v. Parkway Bank & Trust Co.*, 682 N.E.2d 401 (Ill. App. Ct. 1st Dist. 1997) for the proposition that when an agent plays multiple roles in a transaction such that a suspicion is raised that he might have a conflict of interest, the third party with whom the agent is transacting must examine his authority with greater scrutiny. R. 178 at 6-7. In that case, the Cultural Center's agent, Barjactarevic, recruited a wealthy partner to establish an organization specifically for the purpose of purchasing the Cultural Center's property. Barjactarevic's partner hired an attorney, who did absolutely no diligence on Barjactarevic's authority to convey the property before drafting the legal documents to execute the sale, which Barjactarevic signed as both buyer and seller. The Court found the attorney's lack of diligence unreasonable in light of the clear conflict of interest posed by the transaction. *Id.* at 408. That case is distinguishable in two critical ways: (1) the conflict in acting as buyer and seller is inherent, egregious and apparent on the face of a transaction, while acting as borrower and guarantor is not inherently suspect (and in fact may often be logical); and (2) Hepp is not a lawyer, nor was Pollard, and neither had a professional duty to conduct exhaustive due diligence on Pierce's authority. The case is therefore inapposite.

> Had Kraft purported to borrow money for Anaconda, *or in a credible manner for Anaconda's benefit,* he could have bound Anaconda even if he in fact intended and managed to steal the money involved. Had Anaconda itself done anything to suggest it had an interest in Robin or in the transactions at issue, a stronger case for apparent authority would be presented.

*Id.* at 692 (emphasis added). More plainly, there was no obvious motivation for Anaconda, a mining company, to guaranty the debt of Robin, a film production company, on a construction debt bearing no relation to the business of any of the parties to the deal. For the court, this was the novelty that triggered Haggiag's duty to inquire.

Ultra Green's interest as a party to the swap agreement, beneficiary of the biodiesel blending tax credit, and business partner and nominal owner of M1 Energy makes the guarantees in this case eminently more reasonable than the one in *General Overseas*. This distinguishes the duty incumbent upon Hepp from the one confronting Haggiag. *General Overseas*, therefore, does not contradict or undermine the verdict.

### 3. Quantum of Evidence of Apparent Authority

In addition to the legal challenges noted above, Ultra Green disputes the evidentiary basis for several of the Court's findings of fact. *See* R. 172 at 8-11; R. 178 at 3-6. Specifically, Ultra Green argues that it was against the manifest weight of the evidence for the Court to conclude that (A) the non-managing

members of Ultra Green failed to exercise reasonable oversight of Pierce's use of his authority; and (B) Hepp's reliance on Pierce's authority was reasonable.[3]

A.     Member Oversight

Ultra Green argues that it was error for the Court to conclude that it consented to or acquiesced in Pierce's exercise of authority by failing to exercise more hands-on oversight. Specifically, Ultra Green contends that the members' failure to review bank statements was given undue weight by the Court in light of "the lack of any evidence that the bank statements would have provided any information not contained in the financial summaries." R. 172 at 10.

But Ultra Green's own witness, Payne, testified that upon reviewing Ultra Green's Citibank records, he learned that the information contained in the periodic financial summaries members had received was false. *See* Payne Judicial Exam, R. 170 at 385-88. What appeared to be $3 million owed by Ultra Green to M1 Energy in the financial summaries failed to account for nearly twice that amount withdrawn from Ultra Green's account for the benefit of M1 Energy. *Id.* In other words, credible trial testimony from one of Ultra Green's key witnesses established that approximately $5.7 million in unauthorized withdrawals by Pierce were discovered by Ultra Green's members simply by reviewing the corporate Citibank records, to which the Paskvans had unfettered access. Unfortunately, that review

---

[3] Ultra Green also argues that "[t]he Court was in error in not recognizing that there were two separate transactions at issue." R. 172 at 5. The Court disagrees that the swap agreement and the Hepp Notes constitute separate transactions, but even if they did, Ultra Green has not explained how that fact would invalidate the Court's analysis and verdict.

came several years too late. This failure is material, highly relevant, and the Court was not in error for considering it.

Ultra Green points to a few facts it claims weigh against the Court's finding. For example, it points to Paskvan's testimony that he communicated frequently with Pierce about the business of Ultra Green by email and by phone and reviewed regular financial reports which he mistakenly believed were accurate. R. 172 at 9. Ultra Green also urges the Court to consider Pierce's concealment of the transaction and allegedly knowing breach of his fiduciary duty to Ultra Green. *Id.* But these facts, credited as true, are not particularly compelling evidence in Ultra Green's favor, and the Court has already explained why:

> [C]ritically, especially in a small business, I found it surprising and -- not difficult to believe, but somewhat surprising that someone would allow what he called his company to be operated with absolutely no review of the underlying critical documents of any small business, the checking account or the ledgers of the company. Ledgers can be doctored. Financial statements -- unaudited financial statements don't necessarily reflect the true state of affairs of a company. The bank statements are your best source of information about a small business.

R. 160 at 7-8. Accordingly, in assessing adequacy of the members' oversight, the Court afforded much weight to the fact that the Paskvans and other members of Ultra Green did not review corporate bank statements. *Cf. Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 678 (7th Cir. 2004) (citing authority) (holding that in promptly conducting an audit of its agent's business activities, the principal acted in a reasonable and timely manner consistent with its diligence requirements under Illinois law). The Court's finding was thus not against the manifest weight of the evidence.

B.     Reasonable Reliance

Ultra Green also posits that the Court's determination of Hepp's reasonableness is entirely undermined by the fact that "[a] minimal inquiry would have revealed that Pierce was not authorized by Ultra Green to execute the guaranty." R. 178 at 5.[4] But Ultra Green goes no further, and the Court found, based on reliable evidence, that the contrary was true:

> It was asked, what more could Hepp have done? The defendant suggested Hepp could have insisted on seeing the operating agreement, besides the fact that it is not the practice in the futures business when a broker is in the middle over trades much less documented than these were routinely enforced. What would Hepp have seen if he actually took a look at the operating agreement? That assumes it could be found since it was never utilized in any practical way by Ultra Green for its business until plaintiffs -- or Pierce's ownership in Ultra Green was sold to Kathy Paskvan's company. But even a fair reading of the operating agreement by a layperson such as Mr. Hepp would have shown that the managing members had responsibility for the day-to-day management of the business.

R. 160 at 30. Despite Ultra Green's contention that the Court should have afforded greater weight to steps Hepp did *not* take in verifying Pierce's authority, *see* R. 172

---

[4] Ultra Green directs the Court to three cases holding a third-party's reliance may be unreasonable if it fails to conduct a sufficient inquiry into the agent's authority. Those cases are distinguishable, however, because unlike Hepp, the third-parties in those cases actually knew at the time of the transaction that the agent was acting in bad faith or beyond the scope of its authority. *See Sphere Drake*, 376 F.3d at 674-75 (reliance unreasonable when third-party knew the agent's authority was confined to a specific dollar amount and that the disputed transaction would likely exceed that amount); *Yugoslav-American Cultural Center*, 682 N.E.2d at 407-08 (buyer's reliance unreasonable when agent, who was buyer's business partner, knew that its principal had not approved the deal); *United States v. Acorn Tech. Fund, L.P.*, 295 F. Supp. 2d 494, 511 (E.D. Pa. 2003) (third party's reliance unreasonable when it knew that agent's conduct was fraudulent and prohibited by law and contract).

at 10, the Court believes that its findings of fact comport with the weight of the evidence.

## Conclusion

For the foregoing reasons, Ultra Green's motion is denied. The judgment stands.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated:  March 18, 2016